Oral argument not to exceed 30 minutes per side. Ms. Bales for the appellant. Good afternoon your honors. I've reserved 10 minutes for rebuttal. My name is Suzanne Bales. I'm here on behalf of Gary Wayne Sutton. The writ should issue in this case because Mr. Sutton's capital conviction is the result of a due process violation. As the court knows there are two main issues in front of the court. A Brady violation and a claim of ineffective assistance at sentencing. I'm going to spend most of my time talking about the Brady violation and if time permits I'll discuss sentencing. The Brady violation is a close question. The court is faced with competing legal principles and the fact that this is not a case controlled by AEDPA may be dispositive. This is not a case controlled by AEDPA because there is no state court decision to which deference is owed. The Brady violation was not discovered until Mr. Sutton's case came into federal court and the state of Tennessee waived exhaustion. The district court permitted an evidentiary hearing and made factual findings and legal determinations. There is no deference and this court may apply the constitutional principles as it sees fit. Is it clear that when you say they waived exhaustion that vitiates the Cullen v. Penholster ruling or is it that Cullen only applies when you are applying AEDPA deference? They waived exhaustion and the case proceeded to evidentiary hearing. There was some skirmishing in the district court over whether this evidence could have been developed in state court. Mr. Sutton, the evidence actually after his case had completed post-conviction at the trial level, the Tennessee Board of Medical Examiners released an order revoking Dr. Harlan's license. Let me just step back. The issue of when death happened was clearly at issue in the state proceedings, right? So it wasn't newly discovered in that sense. That's correct. So the issue was the qualifications or the attacks upon one or more of the witnesses. The issue is that the state of Tennessee called Dr. Harlan at trial. That was the only scientific evidence that the state offered in support of its theory about the case. The testimony of Dr. Harlan was very carefully crafted to specifically viscerate Mr. Sutton's expert testimony. Dr. Harlan was asked about qualifications and he made a point of saying that because he was a licensed forensic pathologist and because he was the state of Tennessee's medical examiner, he had better qualifications than Dr. Wolf, who was Mr. Sutton's expert. Now by the time when you said he was, was it clear that that was past tense because there was stuff in the public press that he was no longer the state of Tennessee medical examiner at the time of the trial? Is that correct? There was, defense counsel asked Dr. Harlan to clarify that specific issue and Dr. Harlan explained that that was a matter of debate. There was some press at that time because Dr. Harlan was involved in a political dispute with then mayor of Nashville, Bredesen. However, almost all of the Brady material that's in this record were confidential TBI files and were not public records and are so far removed from the political skirmishing that Dr. Harlan was having at that time. I'd also point out that one of the discovery motions in the district court, the state, the attorney general's office agreed to provide the discovery as long as a protective order was put in place. And the only way the bulk of this discovery, the bulk of the Brady material could have come to light was through federally ordered discovery. But even as Dr. Harlan testified in this trial, we now know and the TBI knew at the time of this trial that Dr. Harlan was under investigation. Even as he sat in the witness stand, he was under investigation by the Tennessee Bureau of Investigation. Several of the investigations are, quite frankly, shocking. There are findings that Dr. Harlan fabricated causes of death, that he missed causes of death, that he falsified death certificates. There was an investigation into whether he was allowing unlicensed non-medical people to conduct autopsies. There was an investigation into whether he committed questionable billing practices. A problem that the TBI had with Dr. Harlan was there would be a case that was obviously a criminal homicide case, and Dr. Harlan would come back that it was an accidental death. And so TBI had sought outside expert opinions to try to understand this. And one of the experts in particular reviewed one of the cases Dr. Harlan worked on and noted that it was far outside the professional standards that one expects of a medical examiner. And all of this investigation by TBI was going on at the same time as Dr. Harlan testified in Mr. Sutton's capital trial. How much and in what ways was TBI involved in this case, in the investigation of this case? TBI had extensive investigation. It's fair to say they were the lead investigative agency. TBI conducted numerous, and I believe it was around 35, witness interviews. TBI, every step of the way in this investigation, when TBI conducted a witness interview, they typed up a report and sent it to the prosecutor. TBI also collected... Investigating Mr. Griffin's death. Yes. Yes, the TBI was extensively involved in the investigation of Mr. Griffin's death. TBI agents took statements from Gary Sutton. TBI agents testified at his jury trial. And there's no question, but the TBI led the investigation in this case. But your point is also that TBI simultaneously was investigating Dr. Harlan? Dr. Harlan, yes. Yes. At the same time? Yes. The time frame of those overlap. They're on all fours. And the district court, when it held the hearing, it was constrained to find that this evidence was exculpatory. And I don't believe the prosecution is going to say it was... the Attorney General is going to say it was not. Clearly... And extremely useful for cross-examination, really. Yes. I mean, if you knock... it definitely would help you to knock out his testimony. And if you knock out his testimony, you rely then back on circumstantial evidence alone. Is that a fair reading? It is. And the Supreme Court has said that when you're looking at the materiality of evidence, what you need to do is look at how did the prosecution view this evidence. So, after Mr. Sutton had called Dr. Wolfe, who was a general practitioner who had served as a county coroner, and although he was poorly qualified, he was experienced with things that indicate what a fresh body is. So, after Dr. Wolfe explained these factors to the jury, that was the end of the case. The defense rested, and instead of moving on to closing argument, the prosecution was able to persuade the trial court to halt proceedings. And General Flynn testified at the evidentiary hearing that he called the Tennessee Attorney General's conference and asked for help finding a witness. Dr. Harlan traveled from Nashville to Blount County overnight and then appeared the next day to testify. So, clearly, Dr. Wolfe's testimony about time of death instilled, at least in General Flynn, some doubt about his case. Otherwise, the case would have moved forward at that point. All of this happened over Labor Day weekend. The parties had been in trial for several days, and rather than let the case go to the jury, General Flynn sought an expert to rebut the defense brief. And then, this case is one, when we're looking at materiality, you know, there's some cases in which, you know, it really is about a battle of experts as far as time of death. This is a case in which there was a great deal of other evidence going to the question of time of death. You'd concede that, wouldn't you? This is a case with a large number of witnesses. There was no other scientific evidence. I know, but there was lots of lay proof. There is lay testimony that they heard gunshot at a certain time of night and that the body was found. And there's all this evidence about what happened on that night between Griffin on the one hand and Sutton and Dellinger on the other. That is correct. And Her Honor brings up an interesting point, which is that Sutton was actually very close friends with Griffin. He was, as discussed in the sentencing section, Mr. Sutton was very close friends with Griffin, but he was also Dellinger's nephew. And as the district court, Judge Varlin, in looking at this evidence observed, there's actually no direct evidence linking Sutton to the crime. There's ballistic evidence linking Mr. Dellinger, but there's no ballistics on Gary Sutton. There are lots of witnesses to answer the court's question. There is a witness who testified that he heard gunshot at the time the state posits. This was in an area near the Great Smoky Mountain National Park in rural Blount County. Gunshot is not that unusual. I'd like to spend a moment to talk about the state's response. Actually, let me say, this is also what the district court found. The district court found the evidence was exculpatory, but it denied relief based on a prosecution personal knowledge requirement. And we know that there are several Supreme Court cases that say there's not a requirement that the prosecution have personal knowledge. When we filed a motion to alter or amend and argued this case law to the court and talked about the overlap in the Tennessee Bureau of Investigation, the chronology of that, the court did grant a certificate of appealability and noted that maybe there's not a personal knowledge requirement of the prosecutor, but there needs to be a personal knowledge requirement of the person who possesses. The person who possesses this evidence needs to be on the team is basically what the district court came down with. And I think that's a difficult issue here. You mean in terms of how far the net goes if the people, if it's the TBI in Nashville and none of them are working on this trial in Blount County, which is a different part of the state, is that enough to break the chain? What do you think the law on that is? I think the law is very clear that the prosecution is the architect of the proceeding. That's what the Supreme Court said in 1967 in Brady v. Maryland. Harlan, as you just explained, Harlan is not on the prosecution team until the day or so before. So the prosecutor up here in Blount County pulls in Harlan and in some way you've got to, I know they're all called State Attorneys General, but it's the District Attorney General, it's this Blount County team that you need to connect to Harlan's problems, right? That's, I'm not sure I agree with that. Do you think anybody that's under investigation by any criminal, by TBI somewhere in the state, that that's attributed to a prosecutor? There is actually overlap in the TBI as far as, there are several, probably a dozen lab reports that were conducted by, in Mr. Sutton's case, that were admitted into evidence. There were TBI special agents who were experts who testified. Is it right, essentially though, from the timeline you gave us, all that's happening before they reach out to look for an expert and happen to get Harlan? That's right. It's not like the same, I mean if the same TBI agents had recommended him, you'd be way ahead of the game. I would, and that's what makes this case difficult. That's why I'm trying to sort out how much. The director of the Tennessee Bureau of Investigation had investigated complaints about Dr. Harlan coming into the Tennessee Bureau of Investigation lab. And the TBI director and assistant director had issued directives that Dr. Harlan was not to come into the Tennessee Bureau of Investigation laboratory. Am I right, did I hear you right, that he had reached out to the Attorneys General Association to get a, he didn't reach out to the TBI to get, it wasn't the TBI that recommended Harlan, it was these other Attorneys General. That's correct, Your Honor. And that brings up an interesting point, which is that on direct appeal, Mr. Sutton's defense attorneys jumped up and down about Dr. Harlan, there's this witness, we've had no notice on it, we can't really do it in a motion for new trial because we don't have investigative services then. And the Attorney General's office argued that that argument should fail because they were not talking about Dr. Harlan's qualifications. Did nobody, I mean I've just, from research, from understanding, not everything bad about Harlan was public, but a lot of bad stuff was public, right? I mean that he had been discharged, that he'd had sexual harassment, that he said this girl had laryngitis when she died of a drug overdose, and so on and so on. That was all in the public press. Was none of that recognized in Blount County during the trial? Did they just not know about it? They did not know about that, and that stuff is inflammatory, the sexual harassment charges are inflammatory, but the depth of the bad conduct and the fact that there were numerous... I quite agree with you that the depth is quite additional, but I was just interested in whether it sort of looked to me as though there was in the public domain, it might not have been found by the defense attorneys at that moment, they only had a couple of days, you're quite right, but there certainly was stuff that could have been used, but basically they simply didn't come up with it. Is that correct? Dr. Harlan negotiated his departure from the city of Nashville, and part of that negotiation was we're not going to throw stones at each other. He was also discharged as the state medical examiner. I know he started out with trouble in Nashville, but am I right, he was the state medical examiner, and then he was discharged before the trial, and that was in the public domain. He may have argued that he was still the state medical examiner, but that fight was in the public domain, am I right? The fact that he left his position as the state medical examiner, that was in the public domain. The reasons for that were not, and a lot of that material was covered in Discovery, yes, Your Honor? Just to be clear, there's no indication that the TBI agents who had worked with the prosecutor in Blount County on Mr. Sutton's case were also aware of the investigation of Dr. Harlan? I'm out of time, but if the court permits me, I will answer the question. That is correct as far as the agents on the ground. There was a TBI detective, David Davenport, who did a lot of the questioning, and he operated in East Tennessee. However, it's also correct that TBI, the director of TBI and the assistant director, oversaw all of the investigations that happened, and also oversaw the investigations into Dr. Harlan. They're in a single agency, so of course, the guy at the top, and perhaps another administrator or two, the folks who oversee the work of the people working on the Harlan investigation and the folks working on the Sutton investigation, they would be under common supervision and management at some point up the line, right? Yes, Your Honor. Okay. Thank you, Counselors. I'll have your 10 minutes for rebuttal. Good afternoon. May it please the Court? Nick Spangler on behalf of the Respondent. Here, the District Court correctly denied the petitioner's Brady claim because the impeachment evidence regarding Dr. Harlan was simply not material, and there are two reasons for this. The first reason is that the circumstantial evidence of the petitioner's guilt was powerful, and I'd just like to go through that evidence briefly. The petitioner and his co-defendant were seen leaving a bar together on the night of the murder. Shortly thereafter, witnesses saw the three men scuffling on the side of the road, and when the police came and picked the victim up for public intoxication, he admitted that he'd been fighting with his friends. Later that night, witnesses saw Dillinger's truck with a passenger inside the passenger seat leaving the victim's trailer just before it went up in flames. When the victim's sister confronted the petitioner and Dillinger about the fire, they gave conflicting stories about the last time they'd seen the victim, and Dillinger stated, we're already in enough trouble. The petitioner and Dillinger bailed the victim out of jail at 1125 p.m., and just 30 minutes later, two gunshots were heard in a remote area where the victim's body was later found. The victim died from a gunshot wound to the back of the head, a shotgun wound to the back of the head, and two shotgun shells. The petitioner tries to point out that there's no scientific evidence linking the defendants to this murder, but that's not true. Two shotgun shells found near the victim's body were determined to be fired from the same weapon that discharged a number of spent cartridges found in Dillinger's yard. That doesn't connect it to the body, does it? I mean, you don't get shotgun ballistics. That's true, Your Honor, but just the fact that they're found in Dillinger's yard and the fact that Dillinger and the petitioner had this. Some, but it's not right. Some. It's not. It's not. Okay, I just want to be sure I had that right. It's not the smoking gun, but at the same time it is, so to speak. I thought Ms. Bales' point was that there was, that with regard to Mr. Sutton specifically, there was not any ballistics evidence. That is true. It only directly relates to Dillinger insofar as it was found in Dillinger's yard, but at the same time we have all this other circumstantial proof about these two men being together on the entire night of the victim's murder. When the victim's sister began inquiring, began asking questions about her brother's whereabouts, the petitioner in Dillinger took her to a bar and got her drunk. One of the bartenders there stated that she remembered seeing the two men with the victim the night before, and at that point Sutton asked her to leave the bar with him, and when she declined, he threatened her. Afterwards, they took the victim's sister to a remote area, put her in the vehicle, and lit the vehicle on fire. She was later found partially cremated inside. Moreover, a spent .303 shell casing was found. That material came into Griffin's trial, not just? Into both trials, yes, Your Honor. I believe it was admitted for the purpose of showing motive that they were going to cut, that they did that to cover up the capital murder case before the court. That .303 shell casing found in the Burton vehicle was also determined to be fired from a weapon later found in Dillinger's home. In light of all the circumstantial proof, the state's case in chief pointed undeniably to the petitioner in Dillinger. The second reason that this evidence regarding Dr. Harlan is not material is because Harlan's testimony as rebuttal evidence was simply not essential to the jury's verdict. Indeed, Harlan's time of death testimony was largely superfluous given that the defense expert conceded that he was not qualified to testify about time of death and also his testimony that it was very unlikely that the victim was shot three days before he was found. It was only unlikely. It did not exclude the possibility that the victim was shot within the window of time. The prosecutor was worried enough about it that he asked for the trial to recess and he went about procuring another witness through seeking the assistance of the DA's conference, correct? That's correct, Your Honor. But even if we completely negate Harlan's testimony via impeachment or even if we imagine that it was completely negated or omitted from the trial, we're still left with this strong circumstantial proof of the victim's guilt and ultimately defense expert testimony that is essentially meaningless given that he testifies he's not even qualified to give testimony about time of death. He says something like that but the evidence wasn't excluded so we're kind of speculating because actually that part about he wasn't qualified, that had already come out before the DA was worried enough to get the opposite. Correct, Your Honor. You're speculating on what's in the mind of a jury but you have a guy who's a coroner who deals with dead bodies and he says something that's going to potentially have some impact on the jury. Well unfortunately we're put in a position where we sort of have to speculate about what the jury would have done had this Harlan testimony been impeached. So your view though is that we take out both experts and we just leave the jury thinking about the circumstantial evidence which is reasonably so. And we take out the defense expert from the standpoint because he testified that he's not qualified. Was there a motion, any kind of motion to exclude or re-strike his testimony? Not that I'm aware of, Your Honor. Take it out has to be sort of a way of speaking because you can't take it out. I mean what you're really arguing is that in this analysis it's not very important. Exactly. Basically there's no reasonable probability, not a reasonable possibility that this wouldn't have changed the verdict but a reasonable probability which is certainly a higher standard. Let me ask you then, I haven't heard you contradict them with respect to the fact that we don't give EDPA deference because you've waived exhaustion, the state courts haven't had a chance to see it. So you do have an evidentiary hearing which these days we don't usually after Cullen but they put on some seemingly pretty respectable folks that put this time of death into serious question. You put on somebody who brought it back in but what should we take away from that or did the district court make a finding that would help us there? Can we look at it and say how close is it? The standard is we have to sort of look at what the proof was and the proof was that we had this defense expert who conceded that he wasn't qualified and then we have the Harlan proof that arguably was subject to some impeachment but that's sort of the scenario we're left to speculate about notwithstanding any proof that they later put on. Why did we get there? My first thought in this was Cullen you shouldn't have done all this but apparently there wasn't any objection, you did go through it so under those circumstances what's the weight or what's the standard that we look at that evidence with and that the district court looked at that evidence with? Certainly your honor and I guess again it's a separate issue as to what they showed during the federal habeas hearing and the actual issue which is what the effect of impeaching information regarding Dr. Harlan would be so even though I understand what you're saying because of the depideference maybe we can consider this other evidence about what the time of death actually was that's not exactly the question before the court. The question is the effect of the impeachment material. Are you saying that the only question when we're thinking about prejudice is was there a reasonable probability that having the Brady material if it is Brady material in hand would have had on that jury at that time?  Then what was the rationale for it seems like the hearing assuming it was appropriate the hearing before the district court would have been limited to questions like what information was known to the TBI at the time of the trial was there any link between the TBI personnel who had the information about Dr. Harlan and those who were involved in the prosecution of Mr. Sutton it seems like it would be questions like that and the prejudice would be evaluated the materiality would be evaluated solely based on the trial record. That's I believe a correct understanding an accurate understanding of the way the court should look at this is in terms of the imputation issues it's appropriate to consider the evidence. I don't know the answer to the question I'm about to ask. There wasn't any objection to the district courts taking it outside those parameters. And as far as why there was no objection that's something I'm probably just not able to speak about. I was not I'm sort of playing second chair here I'm coming into the case pretty late in the game and I don't know why there was no objection. It just seems odd. I understand that. If a colon or no colon you're going to be limited to the trial court record in applying the standard for materiality. So no point. That makes sense your honor. I think a lot of the evidence that came in just for my review of the record did relate more to the imputation issue rather than materiality. And certainly it's true as petitioner pointed out I don't believe that the district court ruled on the basis of materiality but certainly this court is entitled to find on any alternative basis that supports the district court's ultimate ruling that the petitioner should not receive relief on this Brady claim. The second point that I'd like to jump to is something that was raised earlier as well. The district court also correctly denied the petitioner's Brady claim because the impeachment evidence was available from a source other than the prosecution. Brady does not apply to information that's not wholly within the prosecution's control or information that's available from another source. As evidenced by a 1995 Knoxville News Sentinel article as well as a 1995 civil action for a writ of possession against Dr. Harlan, the information regarding his discharge as medical examiner or the writ of possession has to do with trying to make him stop claiming he's the medical examiner? Exactly your honor and reclaiming some of the state I believe technology that he had like some computers and what not that the state was trying to recover. And the petitioner makes the point that within this news article and within that civil action all the information about TBI's investigation was not necessarily included with that. And while that may be true the standard is under Owens v. Guida should the petitioner have known the essential facts permitting him to take advantage of any exculpatory information. And certainly via these media reports, these contemporaneous media reports and contemporaneous civil court filings the petitioner could have been independently from anything that the prosecution disclosed would have been able to affirmatively impeach him on whether or not he was the medical examiner, establish that he wasn't and certainly be able to point out other questions about professional misconduct that were raised by these media articles such as sexual harassment suits, questions that were being raised regarding his determinations on autopsies. These were all, this was all subject matter that was raised. What was known via media accounts concerning questions about autopsies? There was one article I believe that talked about he had come to the conclusion that the cause of death was accidental and that there was essentially some sort of disagreement among local law enforcement about that conclusion to the extent that they went and obtained another autopsy. Relating to one case? Relating to what case did you say? One. One case as far as I remember. This is the Tory Bush, did she have laryngitis or did she die of a drug overdose? I can't remember which case it was, but I just know that that was it. The article that I have, which I think is the one you adverted to, the Knoxville News Sentinel of July 1995, which specifically talks about that case as one as well as his opinions in the Elvis Presley case, which I would have thought would have been a matter of common knowledge in Tennessee. Certainly there was information independently available to the petitioner where he could have cross-examined Harlan or that he could have cross-examined Harlan. He could also have attacked his coming on at all since he came in in this sort of late, odd way. That is, with that in hand, you might have persuaded the judge that perhaps he wasn't the right guy to let in at this point. Certainly, and the respondents' positions that we can't nitpick about, specifically what information was different in the TBI files versus the information that was in these contemporaneous media reports and civil court files. Again, the relevant question is, was the essential information necessary to conduct an effective impeachment available? Certainly it was in this case. The third point that I would move on to... The other thing that was available to the petitioner would be cross-examination based on the fact that Dr. Harlan was not the individual who would examine the body after the death. You mean in this other case? No, I'm referring to this case. I mean, he's brought in the... He's got to be relying on records or something. Because he wasn't the doctor that conducted the actual autopsy. Right. And I guess, what's... Well... I take it neither guy was, right? He could have been cross-examined on that and certainly that was already information that was available to the defense. That was my question. Yeah. But the defense expert wasn't either. It was so many years later, wasn't it? Four years later. The trial was in 1996 and the murder was in 1994. And it's not that far. Do you know who did conduct the autopsy? It was my understanding, certainly the local medical examiner prepared a report in which that was part of the basis that they had him testify because he reported that the time of death appeared to be within, I think, either the last 24 hours or more recently. Was that Ellington? Ellington. So Ellington did testify. He did testify. And specifically, at least I believe this is the case, he testified because there was this problem in his... I don't know if it was an autopsy report or just a report generally examining the body that, I think it said, time of death unknown or unspecified and something to the effect that maybe it was more recent than the state had theorized. And so I think the state felt it was necessary to bring him in to say, look, I'm not qualified, I'm not... Ellington did testify then. They brought in their expert that attacked him. Again, they did seem worried enough that they wanted somebody further back. Okay, go ahead. But the third point I make is the district court correctly denied the petitioner's Brady claim because the prosecution had no actual or imputed knowledge of the investigation concerning Dr. Harlan. Brady does not require the prosecution to discover or disclose information that it does not possess or know about. And while the prosecution is presumed to know about information connected in connection with its investigation of the case, a prosecutor has no obligation to learn about information possessed by other government agencies having no involvement in the prosecution or investigation of that case. Brady material may only be imputed to the prosecution team. That means those over whom the prosecutor has authority. Here the prosecution team did not include anyone with actual knowledge of the Harlan information. That is, the prosecutors had no authority over any individual from any agency that had knowledge of this Harlan information. The only state agents with knowledge of the Harlan investigation were employees of the Department of Health, the Tennessee Bureau of Investigation, and even the Attorney General's Office. But those agencies' investigations of Dr. Harlan should not be imputed to the prosecution because those investigations were indeed separate and apart from the prosecution's investigation of this capital murder case. While certain TBI agents admittedly participated in the investigation of this capital murder case, none of those agents were involved in the unrelated Harlan investigation, and vice versa. While other TBI agents were certainly involved in the Harlan investigation, none of those agents were actually part of the prosecution team. Thus, the knowledge of what I'd call these non-prosecution team agents from the TBI must not be imputed to the prosecution because to do so would espouse a monolithic view of the government, a view that federal courts have repeatedly declined to take. For example, in the Strickler decision, the Supreme Court held that a prosecutor's duty to learn of exculpatory evidence extends only to information known by others acting on the government's behalf in the particular case being prosecuted. Similarly, in Locascio, the Second Circuit refused to impute knowledge of exculpatory FBI reports, even though certain FBI agents were part of the prosecution team because those FBI reports were prepared by other FBI agents that had no role on the prosecution team. Similarly, in Quinn, the Second Circuit refused to impute the knowledge of a U.S. attorney from Florida to that of a U.S. attorney from New York. What that demonstrates, both in Quinn and Locascio, is that a government agency may include both employees that are part of the prosecution team and employees that are not part of the prosecution team, but that the knowledge of those non-prosecution team employees need not be imputed to the prosecution unless they're actually on the prosecution team. That may sound like a little bit of circular logic, but it's important to focus on the involvement of the specific individuals of an agency rather than the agency as a whole. And I think that's particularly appropriate in cases like this where you have a more senior-level investigative agency that's not directly beholden to a local district attorney's office. I'm familiar with the law that says local police, that that knowledge is imputed to the district attorney, but that makes sense because of the close relationship between those law enforcement agencies versus when you have sort of a higher-level investigative agency that all the information that's known to them should not necessarily be imputed to a local prosecutor's office. Again, because no one on the prosecution team had knowledge or information about the Harlan investigation, the district court correctly denied relief. And I believe I will limit my argument to this issue since we did not address the ineffective assistance claim unless the court has specific questions about that claim or any further questions about this claim. Any other questions, judges? Okay. Thank you. We'd ask that you affirm the judgment of the district court. The court had some questions about Dr. Ellington, and I would certainly encourage the court to look very closely at the trial and the district court record. Dr. Ellington was the Blount County medical examiner, and he did do the autopsy on Mr. Griffin. And on his autopsy report, he wrote that the date of death was the date the body was found. The district attorney file has a note about conversations with Dr. Ellington in which the district attorney noted although Dr. Ellington believes he's not qualified, he is not a forensic medical examiner, he still believes this is a fresh body. So right in the beginning, the prosecution had an autopsy report that didn't fit with its theory of the case. And when the prosecution called Dr. Ellington, they have a phone conversation about this, and Dr. Ellington says, okay, well, that's outside my expertise, but I still think it's a fresh body. And that's in the prosecution file. They knew from the beginning this was an issue. Are you saying that's Brady material that you didn't get, or you did get it? We offered that at the district court level. Okay, so you had that. He testified in person to something. You examined him or undermined him, so that's all on the record. Dr. Ellington testified at the jury trial that he did the autopsy and that on cross-examination, they tried to bring out these several well-established factors that control time of death, and Dr. Ellington stuck to the prosecution line, that's not my expertise. And it's pretty easy. He might have his own notes. Right. The defense had or didn't have, I'm not clear, whether you did have that. Did have notes. Of the time of death. You had his notes at the trial. At the trial you knew that he had previously determined that he thought it was a fresh body. We did not have that. That is something that we got in discovery, the prosecution file, and this is on Dr. Ellington. In the habeas case? You claim that was a Brady violation. That's correct. The court had questions. Why not? The court had questions about Dr. Ellington, and defense counsel did interview Dr. Ellington, and they knew they had the autopsy report that says one time of death, and when they interviewed him prior to trial, he had the opinion, this is outside my expertise. I just want to be clear about this. So you did not make any Brady claim about some notes that the prosecutor had where he persists in saying it was a fresh body, and you didn't have that note, or are you saying that you really had the same information from the autopsy report and from talking to Dr. Ellington? Defense counsel had that information about what Dr. Ellington. For purposes of trial. Yes. You had the, just to be more specific, you had the information that he had given, and for lack of a better word, an informal opinion to the prosecutor that it appeared to him to be a fresh body, although he was not qualified to give an opinion. That's correct. Okay. And the defense attorneys had talked with Dr. Ellington and were not really able to get him to state a firm opinion. I understand, but they still knew that they had this information that we're just confirming here. Yes. Yes, they did. So Dr. Wolfe and Dr. Harlan, neither one of those experts had the opportunity to view the body. They were looking at one form, one item they looked at was a death scene checklist that was completed by first responders that noted several factors like the presence of rigor mortis, the lack of decomposition. These are the type of facts that Dr. Wolfe said, yeah, everybody that's in this business looks at this, and based on these well-known factors, this is a fresh body. But the prosecution was able to, there was a discussion about whether Dr. Wolfe conceded his qualifications, and I'd like to clarify that. Dr. Wolfe conceded that he was less qualified than Dr. Ellington because Dr. Ellington was a pathologist. But they actually had a very heated argument with the jury out as to whether they could get Dr. Wolfe to say he's not qualified. And the trial court instructed the prosecutor he could not get Dr. Wolfe to say I'm not qualified. So the prosecution did everything but that and then brought in Dr. Harlan to do what the trial court had said they couldn't do to Dr. Wolfe on cross-examination. I probably made that as clear as mud. And I would like to follow up on the standard for materiality. It's not a sufficiency of the evidence test. Mr. Sutton does not have to show that he would have had an acquittal. All he needs to show is that this evidence would have undermined the confidence in the verdict. Let me ask you that because I was interested in what the next thing you were going to say was because I've seen cases that use the phrase a reasonable probability of a different outcome, and I've seen cases that use the phrase that you did sufficient to undermine confidence in the outcome. Are those alternatives or is one a definition of the other or am I using them in the wrong context or are they really the same? I believe they're the same, Your Honor. Is this a verdict worthy of this court's confidence, knowing that the jury was invited to consider Dr. Harlan's testimony and knowing that the jury didn't have accurate information about Dr. Harlan? I would like to point out that the district court classified the evidence as a battle of the experts. He stated this case as a battle of the experts. So given that it's a battle of the experts, the jury should have— Not very expert experts. Right. The jury should have had accurate information about each expert. I also—did His Honor have a question? I also invite the court to look very carefully at all of the records. To be clear, there was inflammatory news articles about Dr. Harlan's sex excapades. There were lawsuits, and Dr. Harlan seemed to be a bit of a media person, but the extent of unprofessional gaffes and the use of nonexistent science, which is documented in the TBI files, that was not in the newspaper. That was not a public record. That was only undercover through federally ordered investigation. Counsel, what I was going to ask was in terms of a battle of the experts at the federal district court level, you also had sort of a battle of experts, and we had some discussion about that. Did the district court make any finding or any rubric as to why those people were now testifying and what should be done with that testimony? The district court, in the habeas petition, there was a NAPU claim because— Sorry, what kind of claim? A NAPU false testimony. Oh, N-A-P-U-E. Sorry. There was a NAPU claim that Dr. Harlan had tested that his science itself was false because he did give some incredible testimony that you could pinpoint the time of death precisely by looking at slides. So the district court stated that because there was a hearing, he didn't want to dissect the claims up. He would let the parties put on their proof. That was the court's reasoning for that. And there was also, as the attorney general argued, there's a question about Dr. Wolfe's qualifications. So in the petition, there was an ineffective assistance claim based on using Dr. Wolfe. And so that was part of the district court's reasoning for permitting the evidentiary hearing. Did he make any ultimate finding as a result, finding a fact from what all the experts said before him? As far as the time of death, he did not. He just said, well, it's an imprecise science. You've got a battle of the experts here. Let them put it in. We'll sort it out. That's the Kentucky and Tennessee way. Yeah. One final point I'd like to make is that Giglio and Kyles v. Whitley both talk about the prosecution duty to actively inquire about the presence of Brady material. The prosecutor at this case testified that he never asked a single person about Brady material related to Dr. Harlan. And it's for that reason that although this is a close case, fundamental fairness would suggest that Mr. Sutton should get a new jury trial. Let me ask you about that last thing because that's actually where I was going to come back to to both press you and let you sum up, which was you started out by saying this is a close case. A lot of the things you've argued I'm sure you don't think are even close. What's the part that makes it close that ought to be the last thing we look at it turning on? Is it close because it might be material? Is it close because it might be prejudicial? Is it close because they might not have known? Which part of it is close? I'm sure some of them you think are not even close. I think that lower court holdings on how to apply the prosecution team, the lower court holdings are not in harmony. How wide to cast the net? Correct. And Judge Marlin was troubled by that. But I would argue that the Supreme Court precedent is consistent from 1960 up to now, that the prosecution is the architect of the proceeding. And their goal is to see that justice is done. And in this case... Does that phrase come from a particular case? It comes from Berger. And in this case, the prosecution was troubled about its jury trial. It found an expert, but it didn't ask a single question on an expert who's available on Labor Day weekend, didn't ask a single question. And that does not comport with due process. I didn't follow that. On that Labor Day, who didn't ask a single question of anybody? I know that you make the point that the prosecutor didn't cast the net wider. Is that the single question we're talking about? Correct. The Supreme Court says the prosecution should inquire. Is that a matter... How do you envision courts of appeals using that idea, the failure to inquire? It strikes me as... I mean, it sounds like it's something a disciplinary matter would consider, but what do we do with that? Beyond question, the question for this court is, was Gary Sutton's trial fair under Brady and due process? That is the rubric that this court is going to look at. Going to be one feature that we'll put in that analysis? Is that how you figure it? Well, that gets into materiality. But there are a couple of different Supreme Court cases, Kyles v. Whitley and Giglio, which both talk about prosecutors need to know how to manage their offices, and they need to know how to ensure that they comply with their Brady obligations. Thank you, Your Honors. Anything else? Thank you, Counsel. The case will be submitted and the clerk may adjourn court. This honorable court is now adjourned.